1

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY CLARK, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>        v.<br><br>A BOOK COMPANY, LLC D/B/A ECAMPUS.COM,<br><br>                                        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    Plaintiff Kelly Clark ("Plaintiff") brings this action on behalf of herself and all others

2    similarly situated (the "Class Members") against Defendant A Book Company, LLC d/b/a

3    eCampus.com, ("Defendant" or "eCampus").  Plaintiff brings this action based upon personal

4    knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by

5    and through the investigation of undersigned counsel.

6    <u>**NATURE OF THE ACTION**</u>

7    1.    This class action lawsuit is brought on behalf of all California residents who have

8    accessed and used Defendant's web-based reading materials service, ecampus.com (the

9    "Website"), to search for, obtain, or otherwise access reading and materials (the use of the Website

10    known as the "eCampus Service").

11    2.    Defendant aids, employs, agrees, and conspires with third parties Meta Platforms,

12    Inc., formerly known as Facebook, Inc. ("Facebook") and Listrak Inc. ("Listrak" and together with

13    Facebook, the "Third Parties") to intercept communications sent and received by Plaintiff and Class

14    Members, including communications containing protected reading preferences.  Plaintiff brings this

15    action for legal and equitable remedies resulting from these illegal actions.  By failing to procure

16    consent before enabling Facebook and Listrak's interception of these communications, and by

17    disclosing such information to Facebook and Listrak, Defendant violated the California Invasion of

18    Privacy Act §§ 631-632 and the California Constitution.

19    <u>**PARTIES**</u>

20    ***Plaintiff***

21    3.    Plaintiff Kelly Clark is a citizen of the State of California over the age of 18, and

22    lives in Rohnert Park, California with an intent to remain there.  Plaintiff Clark is therefore a

23    resident of California.

24    4.    Plaintiff Clark used the eCampus Service on the Website to search for and rent

25    textbook materials in approximately June 2024.  For the past year, Plaintiff Clark has accessed the

26    Website multiple times to search for and obtain textbook materials.

27    5.    When Plaintiff Clark used the Website to view and rent or purchase reading

28    materials, Defendant enabled the Third Parties to intercept her communications with the Website

while she viewed or obtained books on the Website.  Defendant simultaneously disclosed this information in conjunction with Plaintiff Clark's personally identifiable information ("PII") to Facebook and Listrak.  Specifically, as a result of Defendant's unlawful conduct as alleged herein, Defendant enabled, employed, aided or otherwise allowed the Third Parties to intercept and collect information about Plaintiff Clark's search, view, and rental history on the Website.

6.      At all relevant times, Plaintiff Clark never consented to, agreed to, or otherwise permitted Defendant to disclose or otherwise allow access to her personally identifiable information and the record of materials that Plaintiff Clark viewed and obtained on the eCampus Service to third parties, including to Facebook and Listrak.

7.      Likewise, Defendant never gave Plaintiff Clark the opportunity to prevent the disclosure of her personally identifiable information and the record of materials that Plaintiff viewed and obtained on the eCampus Service to Facebook and Listrak.

8.      Plaintiff Clark has an active Facebook account, which she has maintained for multiple years.  During that time, Plaintiff Clark routinely logged onto her Facebook account on the same web browser she used to access Defendant's Website.

9.      Pursuant to the systematic process described herein, Defendant assisted Facebook and Listrak with intercepting Plaintiff Clark's protected communications on the Website without her consent, including those that contained personally identifiable information and reading preferences.

10.      By failing to receive the requisite consent from Plaintiff Clark, Defendant breached its duties of confidentiality and unlawfully disclosed to or otherwise enabled or employed the Third Parties to obtain Plaintiff Clark's personally identifiable information and protected reading preferences.

### Defendant

11.      Defendant A Book Company, LLC d/b/a eCampus.com, is incorporated in Kentucky and has its principal place of business at 2415 Palumbo Drive, Lexington, Kentucky 40509.  Defendant owns and operates the textbook rental and purchase catalog available nationwide and found at ecampus.com.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of a different state than Defendant.

13.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California, including shipping books to individuals in California, such that Defendant has significant, continuous, and pervasive contacts with the State of California.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District and Plaintiff used Defendant's eCampus Service in this District and received a book in the mail from Defendant in this District.

**FACTUAL ALLEGATIONS**

**I.     OVERVIEW OF THE LAW**

**A.     California Information Privacy Act**

15.     The California Information Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*., prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

16.     To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether
> physically, electrically, acoustically, inductively or otherwise, with
> any telegraph or telephone wire, line, cable, or instrument, including

the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.    Section 631(a)'s applicability is not limited to phone lines but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*,  956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

18.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

19.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

20.     Individuals may bring an action against the violator of CIPA §§ 631 and 632. Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.     California Patron Use Records Act**

21.     The California Legislature enacted the Patron Use Records Act to protect certain privacy rights of California citizens accessing library services.

22.     The California Patron Use Records Act, Cal. Gov't Code § 7927.105, prohibits the unauthorized disclosures of information that identifies a library patron's "borrowing information or use of library information resources" and "[a]ny written or electronic record that is used to identify a library patron." Cal. Gov't Code § 7929.105(a). The prohibited records that could be used to identify a patron "include[], but is not limited to, a patron's name, address, telephone number, or email address." *Id.* at (a)(1). And the prohibited records that identify a person's borrowing information or use of library resources "includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries." *Id.* at (a)(2).

23.     The statute prohibits disclosure of such information "to any person, local agency, or state agency," except for use in library administrative duties, with the patron's authorization in writing, or by court order, and creates a privacy interest for Californian library patrons in their personally identifiable information and their borrowing information and library resource usage. *Id.* at (c).

24.     As can be seen from the enaction of this statute, California has a strong expressed legislative intent to protect the privacy rights of individuals' reading materials and uses of research materials—going to lengths to ban disclosures of which individual searched for or obtained which library materials and library resource information.

**C.     California Reader Privacy Act**

25.     The California Reader Privacy Act, Cal. Civ. Code § 1798.90, was enacted to further prevent providers of book services from disclosing or being compelled to disclose "any personal information relating to a user of the book service." Legislative Counsel's Digest to Cal.

Civ. Code § 1798.90.  The statute prohibits "commercial entit[ies] offering … book service[s] to the public" from "knowingly disclos[ing] to any government entity," or being "compelled to disclose to any person[] [or] private entity" a user's "personal information." *Id.*

26.    A "[b]ook service" is defined as a service that primarily "provides the rental, purchase, borrowing, browsing, or viewing of books."[1]  Cal. Civ. Code § 1798.90(b)(2). Defendant's eCampus Service constitutes a book service here.

27.    "Personal information" is defined as:

(A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.

(B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

(C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

Cal. Civ. Code § 1798.90(b)(2).

28.    While this statute focuses on prohibiting disclosures of personal information to government entities, the explicit ban on disclosing "personal information relating to a user of [a] book service" further demonstrates California's strong intent in protecting the private reading and reading-material browsing history of its citizens.

## II.    OVERVIEW OF THE PARTIES

### A.    Defendant Provides Reading Materials From Its Catalog

29.    eCampus.com is "a premier online retailer of new, used and electronic textbooks for sale or rent."[2]  To use the eCampus Service to view and purchase or rent reading materials, a user of the Website must create an account.[3]  Without signing up for an account or signing in, the

---

[1] The statute explicitly carves out stores that sell "a variety of consumer products" with book service sales that "do not exceed 2 percent of the store's total annual gross sales of consumer products sold in the United States," which is not applicable to Defendant here.  Cal. Civ. Code § 1798.90(b)(2).

[2] *About Us*, ECAMPUS.COM, https://www.ecampus.com/about-us?srsltid=AfmBOorC5ttgl-T2K22rARY1ebcXC3VhkvbT5FKuAvBI8a1V9YluE3Pq (last accessed June 4, 2025).

[3] *Sign in*, ECAMPUS.COM, https://www.ecampus.com/sign-in (last accessed June 4, 2025).

1    Website will not allow users to purchase or rent reading materials.[4]  Notably, to sign up for an

2    account, users must provide their first and last name and email address.[5]

3        30.    eCampus.com was originally founded and launched on July 2, 1999.  It raised $91

4    million during the dot com bubble.[6]

5        31.    Defendant owns and operates the Website, which provides the eCampus Service and

6    distributes, sells, and rents reading materials to consumers across the entire United States.

7        **B.    The eCampus Service Integrated Third Party Pixels**

8        32.    ***Facebook.***  Per Plaintiff's counsel's investigation, Defendant aids, agrees with,

9    employs, or otherwise enables Facebook to intercept, individual users' personally identifiable

10   information in the form of their Facebook account and the full title of the materials that individuals

11   search for, listen to, and purchase on the eCampus Service.  This is achieved through Defendant's

12   integration of a piece of tracking pixel call the Facebook Pixel ("Facebook Pixel") onto the

13   Website.

14       33.    A research paper presented at the Association for Computing Machinery Web

15   Conference in 2023 states that "[a tracking pixel] is a piece of JavaScript code added to a website

16   as a graphic element[, ] 1 × 1 pixel [in size,] that is loaded when a user lands on the website hosting

17   it."[7]  "When a user visits a [tracking pixel]-enabled website, an instance of the [tracking] pixel

18   loads in the HTML code of the page on the browser."[8]  "[I]f a corresponding … cookie does not

19   exist on the browser, one is created and a unique ID is saved[.]"[9]  Then, the tracking pixel's

20   "embedded [] URL point[s] to [a third party's (i.e., Facebook)] servers[] … [and] report[s] to [the

21   third party (*i.e.*, Facebook)] the user['s] activity for the duration of the visit[,]" along "with [the]

---

22   [4] *Id.*

23   [5] *Id.*

24   [6] *About Us*, ECAMPUS.COM, https://www.ecampus.com/about-us?srsltid=AfmBOorC5ttgl-T2K22rARY1ebcXC3VhkvbT5FKuAvBI8a1V9YluE3Pq (last accessed June 4, 2025).

25   [7] Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with*

26   *Invisible Pixels and Click IDs*, at 2, (2023) ARXIV, https://arxiv.org/pdf/2208.00710 (last accessed Feb. 4, 2025).

27   [8] *Id.*

28   [9] *Id.*

---

specific ID reflecting the specific [website user.  This] can be used [] to track [] audiences for brand ads[.]"[10]

34.    To implement a tracking pixel, a website administrator simply places on their website "[t]he [b]ase [tracking p]ixel code[, which] is a small segment of JavaScript code [that] acts as an 'initiator' for the [tracking p]ixel['s] behavior."[11]  Once active, this code will load "a library of functions [(*i.e.*, fbevents.js for the Pixel] … on the website[.] … This library is the core mechanism[s] of the FB Pixel."[12]  In addition, "the webpage administrator [] define[s] … the behavior they wish to track and report to [Facebook], by defining *events*, *i.e.*, actions, that a user takes on the website."[13]  When in use, the tracking pixels then "reports to [Facebook] information about [each] event and [the] user that caused it," for Facebook's "future use in ad-conversion and further user profiling and tracking[.]"[14]

35.    Defendant aids, agrees with, employs, or otherwise enables Facebook to intercept to individuals' personal information so that it can obtain the marketing, advertising, and analytics technological tools that Facebook provides.  Facebook describes itself as a "real identity platform,"[15] meaning users are allowed to "create only one account using the name they go by in everyday life that represents their authentic identity."[16]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[17]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, The Wall Street Journal, Oct. 21, 2021, https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed Feb. 4, 2025).

[16] *Authentic Identify Representation*, Meta, https://transparency.meta.com/policies/community-standards/authentic-identity-representation (last accessed Feb. 4, 2025).

[17] *Create A New Account*, Facebook, https://www.facebook.com/reg/ (last accessed Feb. 4, 2025).

36.     In 2024, Facebook generated $164.5 billion in revenue.[18]  Approximately $160.6 billion of that was earned through advertising.[19]

37.     Facebook sells advertising space by highlighting its ability to target users.[20] Facebook can target users so effectively because it surveils user activity both on and off its site.[21] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[22]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[23]

38.     Advertisers can also build "Custom Audiences."[24]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[25]  With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[26]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply

---

[18] *Meta*, https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx (last accessed Feb. 5, 2025).

[19] *Id.*

[20] *Why Advertise On Facebook, Instagram and Other Meta Technologies*, Meta, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[21] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[22] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[23] *Meta*, https://www.facebook.com/business/news/Core-Audiences (last accessed Feb. 4, 2025).

[24] *About Custom Audiences*, Meta, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed Feb. 4, 2025).

[25] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

[26] *About Lookalike Audiences*, Meta, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed Feb. 4, 2025).

Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[27]

39.      As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[28]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

40.      The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[29]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[30]  Advertisers can even create their own tracking parameters by building a "custom event."[31]

41.      Facebook offers the Facebook Pixel as a Business Tool to advertisers, like Defendant, to integrate into their websites.  The Facebook Pixel "tracks the people and type of

---

[27] *Create A Customer List Custom Audience*, Meta, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last accessed Feb. 4, 2025); *Create A Website Custom Audience*, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed Feb. 4, 2025).

[28] *The Meta Business Tools*, Facebook, https://www.facebook.com/help/331509497253087 (last accessed Feb. 4, 2025).

[29] *See Meta Pixel: Advanced*, Meta, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last accessed Feb. 4, 2025); *see also Best Practices For Meta Pixel Setup*, Meta, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed Feb. 4, 2025); *Marketing API: App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

[30] *Specifications For Meta Pixel Standard Events*, Meta, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed Feb. 4, 2025).

[31] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed Feb. 4, 2025); *see also Marketing API: App Events API*, Meta https://developers.facebook.com/docs/marketing-api/app-event-api/ (last accessed Feb. 4, 2025).

---

actions they take."[32]  When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website.  At relevant times, two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code, and Facebook's embedded code.

42.    Defendant chose to include the Facebook Pixel on its Website.

43.    Facebook's own documentation makes clear just how much tracking of private information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. *Find … people who have visited a specific page or taken a desired action on your website*."[33]

44.    Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, *the pixel will log when someone takes an action on your website*.  Examples of actions include adding an item to their shopping cart or making a purchase.  *The Pixel receives these actions, or events*, which you can view on your [Facebook Tracking] Pixel page in Events Manager.  From there, you'll be able to see the actions that your customers take.  *You'll also have options to reach those customers again through future Meta ads*.[34]

45.    The Facebook Pixel code enables Facebook not only to help Defendant with advertising to its own users outside the Website, but also to include individual users among groups targeted by *other* Facebook advertisers relating to the conditions about which users communicated on Defendant's Website.

---

[32] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last accessed Feb. 4, 2025).

[33] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (emphasis added) (last accessed Feb. 4, 2025).

[34] *Id.* (emphasis added).

46.    Facebook's Business Help Center explains:

> Meta **uses marketing data to show ads to people who are likely to be interested in them**.  One type of marketing data is website events, which are **actions that people take on your website**.[35]

47.    In other words, Facebook sells advertising space by highlighting its ability to target users.[36]  Facebook can target users so effectively because it surveils user activity both on and off its site.[37]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "people who share interests with … current customers."[38]

48.    An example illustrates how the Facebook Pixel works.  Take an individual who navigates to Defendant's Website and views or buys a particular book or audiobook.  When that action is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because the eCampus Service integrated and utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

49.    After collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

50.    **Listrak.**  Per Plaintiff's counsel's investigation, Defendant also integrates and therefore enables Listrak to intercept individual users' communications with Defendant in the form

---

[35] *About Standard And Custom Website Events*, Meta, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added) (last accessed Feb. 4, 2025).

[36] *Why Advertise On Facebook, Instagram And Other Meta Technologies*, Meta, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 4, 2025).

[37] *About Meta Pixel*, Meta, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 4, 2025).

[38] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 4, 2025).

of users' full name, email address, and the full title and the ISBN of the materials that users search for, rent, or purchase on the eCampus Service. This is achieved through Defendant's integration of a piece of tracking code onto the Website ("Listrak Tracker").

51.    Defendant chose to integrate the Listrak Tracker onto its Website.

52.    The Listrak Tracker works similarly to the Facebook Pixel and allows Defendant "capture critical customer signals and links" at "every touchpoint across the customer journey – both online and offline."[39] Listrak's "platform can do it all … [to] send messages at precisely the right time across the right combination of channels and devices to maximize customer engagement, revenue, and lifetime value."[40] Defendant allows Listrak to intercept users' personally identifying information and the information they viewed or obtained on the eCampus Service to Listrak via the Listrak Tracker so that it can obtain the marketing, advertising, and analytics technological tools that Listrak provides.

53.    Listrak's own website describes how much private information of users, including users' private reading information, can be captured through the Listrak Tracker. The Listrak Tracker allows Listrak to "[o]bserve, report[,] and react to customers before they have provided a channel identity such as email or mobile number."[41] Listrak then compiles user data from "disparate sources" to link them to a "unified, 360 degree marketing view of … customers."[42]

54.    Notably, Listrak's Platform offers clients like Defendant a single platform to capture user data, categorize it into user profiles, predict product recommendations and content, receive insights on its consumer base, and then grow its user base and finances:[43]

---

[39] *Unified Customer Data*, LISTRAK, https://www.listrak.com/platform/unified-customer-data (last accessed June 4, 2025).

[40] *Platform Components*, LISTRAK, https://www.listrak.com/platform (last accessed June 4, 2025).

[41] *Unified Customer Data*, LISTRAK, https://www.listrak.com/platform/unified-customer-data (last accessed June 4, 2025).

[42] *Id.*

[43] *Platform Components*, LISTRAK, https://www.listrak.com/platform (last accessed June 4, 2025).



55.    Listrak's Journey Hub is "at the core of Listrak's cross-channel marketing platform allowing retailers to fully leverage their customer data and unify marketing across the entire customer journey."[44]  With Journey Hub, clients like Defendant can "[d]esign [their] [c]ustomer's [j]ourney" and [o]ptimize engagement for any scenario."[45]  These data-driven suggestions are "based on continuous learnings and insights" from the users' own data that Listrak collects across devices.

56.    Listrak offers developers like Defendant the ability to automatically capture behaviorally triggered signals.  Specifically, Listrak "will listen and respond to individual consumer signals of intent," which Listrak then "translat[es] into actionable touchpoitns of communications."[46]

---

[44] *Journey Hub*, LISTRAK, https://www.listrak.com/platform/journey-hub (last accessed June 4, 2025).

[45] *Id.*

[46] *Why Listrak*, LISTRAK, https://www.listrak.com/company/why-listrak (last accessed June 4, 2025).

57.     After collecting and intercepting the information described in the preceding paragraphs, Listrak processes it, analyzes it, and assimilates it into datasets and data-driven suggested changes for Defendant so that Defendant can boost its marketing, analytics, and advertising.

## III.     DEFENDANT ENABLES THE THIRD PARTIES TO INTERCEPT USERS' PROTECTED READING INFORMATION

58.     Through the Facebook Pixel and the Listrak Tracker, Defendant enables, employs, aids, or otherwise assists the Third Parties with intercepting the identities and online rental activity of Defendant's users on the eCampus Service, including information relating to the reading materials that users viewed and bought.

59.     Defendant assists and enables the Third Parties to intercept and record several categories of personally identifiable information, including email addresses and full names.  An email address is a unique string of characters which designate an electronic mailbox.  As industry leaders,[47] trade groups,[48] and courts agree,[49] an ordinary person can use an email address to uniquely identify another individual.  Indeed, there exist multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[50]

### A.     Defendant Enables Facebook To Intercept Users' Protected Reading And Personally Identifying Information

60.     When a user searches for a book or audiobook on the Website, Defendant enables Facebook through the Pixel to intercept the contents of the user's search.  For example, the following screenshot of the network traffic shows Defendant allowing the Pixel to intercept and send to Facebook the following network transmission of a user creating their registration.  The

---

[47] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, Ad Exchanger (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[48] Network Advertising Initiative, NAI Code Of Conduct 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[49] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[50] *See, e.g.*, www.beenverified.com.

---

screenshotted traffic shows the Pixel intercepting the user's email address, in both plain text and hashed forms:[51]



61.    In addition, Defendant also enables the Pixel to intercept and send to Facebook the user's (hashed) name, phone number, and general geolocation.  As Meta explains on its developers website, "fn" stands for first name, "ln" for last name, "ph" for phone number, "ct" for city, and "st" for state.[52]



62.    Further, Defendant also allows the Pixel to intercept and send to Facebook users' communications with the eCampus Service denoting the specific textbook titles, including its International Standard Book Number ("ISBN"), that a user viewed, purchased, or rented.[53]

63.    In the following screenshot of the network transmissions sent to Facebook through the Pixel, the user viewed and purchased (as evidenced by the event "ev: Purchase") two books: *Digital Marketing Strategy* and *Beginner's Guide to Garden Planning and Design*.

---

[51] The screenshots contained in this Complaint were obtained through Plaintiff's counsel's independent testing.  Personal information shown in these screenshots, including names, email addresses, and Facebook IDs have been redacted.

[52] *Advanced Matching,* META, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/ (last accessed June 4, 2025).

[53] *See About ISBN*, INTERNATIONAL ISBN AGENCY, https://www.isbn-international.org/content/what-isbn/10 (last accessed June 4, 2025).

---

```
URL: https://www.facebook.com/privacy_sandbox/pixel/register/trigger/
HEADER PARAM:
  Referer: https://www.ecampus.com/
  User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36
URL PARAM:
[...]
  id: 1154774987882815
  ev: Purchase
  dl:
https://www.ecampus.com/checkout/thank-you?s=9056572&b=9056573&p=12600204&gt=1&
tsi={775F2516-9C42-4587-A696-3848A742D9B2}&cc=&sm-1=1&handlingfee=0.99&statedel
iveryfee=0&ppoid=
  cd[content_type]: product
  cd[content_ids]: ["9781580116084N","9781398605978R"]
  cd[currency]: USD
  cd[order_id]: 9783801
  cd[num_items]: 2
  cd[tax]: 4.14
  cd[shipping]: 0
  cd[value]: 38.53
  cd[contents]: [ {
            "id": "9781580116084N",
            "content_category": "R",
            "item_name": "Beginner's Guide to Garden Planning and Design",
            "quantity": 1,
            "item_price": 16.59
  }, { "id": "9781398605978R",
            "content_category": "R",
            "item_name": "Digital Marketing Strategy",
            "quantity": 1,
            "item_price": 21.94
  } ]
  fbp: fb.1.1746471607113.954381980788327717
```

64.    An ordinary person with access to a browser on the Internet is able to use the simultaneously disclosed ISBN identifier to verify the book title.  "Any book made publicly available, whether for sale or on a gratis basis, can be identified by ISBN."[54]  In the above intercepted communications, the user purchased two items: the *Beginner's Guide to Garden Planning and Design* has an ISBN of "9781580116084" and *Digital Marketing Strategy* has an

---

[54] *Id.*

ISBN of "9781398605978."  As can be seen from the following screenshots, a simple Google search of the ISBNs is sufficient to locate the exact reading material this particular user purchased.





65.    Due to the integration of the Facebook Pixel on the Website, Facebook is able to intercept the information about the Website page the user viewed.  This information includes the specific reading material(s) that the user searched for, in addition to the user's personally identifying information in the form of their unhashed email and hashed full name.  When Facebook intercepts this communication—made possible by Defendant's integration of the Facebook Pixel— Facebook effectively intercepts the exact reading material(s) that the individual is viewing or has obtained.

66.     Facebook is able to use additional cookies to identify Website visitors.  When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a set of cookies.  The following screenshot depicts the Pixel on the Website capturing and transmitting to Facebook when a user searches for and views J.R.R. Tolkien's *The Lord of the Rings*.  In the following screenshots, the Pixel can be seen transmitting several identifying cookies to Facebook as well as the fact that the user viewed *The Lord of the Rings*.

| ✕ | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |
|---|---|---|---|---|---|---|---|

▾ **Query String Parameters**      [ View source ]      [ View URL-encoded ]

| id | 1154774987882815 |
|---|---|
| ev | ViewContent |
| dl | https://www.ecampus.com/lord-rings-tolkien-j-r-r/bk/9780618640157&pos=1 |
| rl | https://www.ecampus.com/search-results?omn=1&qtype=ISBN&terms=the+lord+of+the+rings |
| if | false |
| ts | 1749073689123 |
| cd[value] | 14.18 |
| cd[currency] | USD |
| cd[content_type] | product |
| cd[content_name] | The Lord of the Rings |
| cd[search_string] | 9780618640157 |
| cd[content_ids] | ["9780618640157R","9780618640157U","9780618640157N","9780618640157D"] |

| ✕ | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |
|---|---|---|---|---|---|---|---|

**Request Cookies**      ☐ show filtered out request cookies

| Name | Value | Domain ▲ | Path | Expires / Max-Age |
|---|---|---|---|---|
| ar_debug | 1 | .facebook.com | / | Session |
| c_user | ██████████ | .facebook.com | / | 2026-06-04T19:23:40... |
| datr | 5mxPZ4PWzl7ENyEaQ... | .facebook.com | / | 2026-01-07T20:41:10... |
| fr | 108ni4LvdXpGrw02N.... | .facebook.com | / | 2025-09-02T19:23:40... |
| ps_n | 1 | .facebook.com | / | 2026-01-08T04:11:03... |
| sb | 5mxPZ9H4Uw-a_jHha... | .facebook.com | / | 2026-01-13T20:38:34... |
| xs | 5%3Ag9k09Z9LNspfQ... | .facebook.com | / | 2026-06-04T19:23:40... |

67.     The major cookie that the Pixel sends is the "c_user" cookie, a unique identifier associated with a single Facebook user's Facebook profile ("Facebook ID" or "FID").  The cookie is a string of numbers that is unique to every Facebook account—distinguishing each FID from its peers.

1    68.    Any person, even those without in-depth technical expertise, can utilize the FID to

2    identify owners of the FID via their Facebook profile.  Once the Pixel's routine exchange of

3    information is complete, the FID that becomes available can be used by any individual of ordinary

4    skill and technical proficiency to easily identify a Facebook user, by simply appending the

5    Facebook FID to www.facebook.com (www.facebook.com/[FID]).  That step, readily available

6    through any internet browser, will direct the browser to the individual FID's profile page, including

7    all the information contained in or associated with the profile page, for the user associated with the

8    particular FID.

9    69.    A user who accesses Defendant's Website while logged into Facebook will transmit

10   the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

11   70.    One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook

12   ID and browser identifier.[55]  Facebook, at a minimum, uses the fr cookie to identify users. [56]

13   71.    If a visitor has never created an account, an even smaller set of cookies are

14   transmitted.

15   72.    At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a

16   browser as a first-party cookie, and which Facebook uses to identify a browser and a user. [57]

17   73.    The c_user cookie expires after 90 days of inactivity on Facebook if the user

18   checked the "keep me logged in" checkbox on the website.[58]

19   74.    The fr cookie expires after 90 days unless the visitor's browser logs back into

20   Facebook.[59]  If that happens, the time resets, and another 90 days begins to accrue.[60]

21

22   [55] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21,
     2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

23   [56] *Cookies Policy*, Meta, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-
24   1.3 (last accessed Feb. 4, 2025).

     [57] *Id.*
25
     [58] Seralthan, *Facebook Cookies Analysis*, Medium (Mar. 14, 2019),
26   https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a (last accessed Feb. 4,
     2025).

27   [59] *See id.*

28   [60] Confirmable through developer tools.

75.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[61]  If that happens, the time resets, and another 90 days begins to accrue.[62]

76.    The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[63]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[64]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

77.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant enabled Facebook to intercept these identifiers alongside the event data.

**B.    Defendant Enables Listrak To Intercept Users' Protected Reading And Personally Identifying Information**

78.    When a user searches for a book on the Website, Defendant discloses to Listrak through the Listrak Tracker the contents of the user's search.  For example, the following screenshot of the network traffic shows Defendant enabling Listrak to intercept the following network transmission of a user searching for *Cryptography and Network Security: Principles and Practice [Rental Edition]*.  The event, denoted by "t_0", informs Listrak and Defendant that the user conducted a "ProductBrowse."

---

[61] *See Cookies Policy*, META, https://www.facebook.com/policy/cookies/ (last accessed Feb. 4, 2025).

[62] Also confirmable through developer tools.

[63] *First-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed Feb. 4, 2025).  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[64] *Third-Party Cookies*, PC MAG, https://www.pcmag.com/encyclopedia/term/third-party-cookie (last accessed Feb. 4, 2025).  This is also confirmable by tracking network activity.

```
URL: https://at1.listrakbi.com/activity/cfihNI64iMZp
HEADER PARAM:
  Referer: https://www.ecampus.com/
  User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36
URL PARAM:
[...]
  gsid: d772e73c-79db-40fe-8d5d-d793432f90a0
  t_0: ProductBrowse
  d_0:
          {
          "title": "Cryptography and Network Security: Principles and
Practice [Rental Edition]",
          "LinkURL":
"https://www.ecampus.com/cryptography-network-security-principles/bk/9
780136707226",
```

79.     The Listrak Tracker also intercepts and sends to Listrak the same identifying information about a user's use of the Website when a user purchases or rents an item, as can be seen in the screenshot below:

```
URL: https://sca1.listrakbi.com/cfihNI64iMZp/cart/update
HEADER PARAM:
  Referer: https://www.ecampus.com/
  User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/135.0.0.0 Safari/537.36
URL PARAM:
[...]
  gsid: d772e73c-79db-40fe-8d5d-d793432f90a0
  sm5: 6806049
  s_0: N9781580116084
  q_0: 1
  p_0: 16.59
  n_0: Beginner's Guide to Garden Planning and Design
  iu_0: https://simages.ecampus.com/images/no_imaged.gif
  lu_0: https://www.ecampus.com/helen-yoest/bk/9781580116084
  m1_0: 1320096578
  m2_0: Buy New
  s_1: R9781398605978
  q_1: 1
  p_1: 21.94
  n_1: Digital Marketing Strategy
  iu_1: https://simages.ecampus.com/images/d/5/978/9781398605978.jpg
  lu_1: https://www.ecampus.com/3rd-simon-kingsnorth/bk/9781398605978
  m2_1: Rent Book
```

80.     Further, the Listrak Tracker intercepts and transmits to Listrak the ISBN of the user's purchased or rented books.  As mentioned earlier, the ISBN of a book, when conducting a simple Google browser search, is sufficient to identify the exact book, if the title alone was not

enough to identify the material(s) a user viewed, rented, or purchased. The ISBNs of rented and purchased books are highlighted above.

81.    In addition, Listrak Tracker also intercepts sufficient personally identifying information that would allow even an ordinary person to identify the user. In the screenshot below, Defendant discloses to Listrak the email address and first and last name. As mentioned above, an email address constitutes personally identifiable information.



82.    Thus, Defendant enables the Listrak Tracker to intercept and send to Listrak the exact reading materials that users search for, view, and purchase on the Website, as well as which individual users did so.

## IV.    DEFENDANT ENABLES THE THIRD PARTIES TO INTERCEPT USERS' PII AND READING HISTORY FOR THE PURPOSES OF MARKETING, ADVERTISING, AND ANALYTICS

83.    ***Facebook.*** Defendant enables Facebook to intercept the foregoing personally identifiable information and record of materials viewed and obtained of users on the Website to so that Facebook can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

84.    According to Facebook, the Pixel "works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[65] The Pixel "relies on Facebook cookies, which enable [Facebook] to match [] website visitors to their respective Facebook User accounts."[66] Facebook offers a menu of "standard events" that can be tracked, including what content a visitor views or

---

[65] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4, 2025).

[66] *Meta Pixel: Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last accessed Feb. 4, 2025).

1  purchases.[67]  Advertisers can also create their own tracking parameters by building a "custom

2  event."[68]

3    85.    This gathered information is used for marketing and advertising.  Specifically, the

4  Pixel's library of functions can be used to "[t]rack conversions [] in the Ads Manager[,] … to

5  define custom audiences for ad targeting, [and] for Advantage+ catalog ads campaigns[.]"[69]

6    86.    Taking these one by one, "track[ing ] website visitors' actions[,] also known as

7  conversion tracking[,] ... can be used to analyze the effectiveness of [a] conversion funnel and to

8  calculate [] return[s] on ad investment[s]."[70]  Once a client is "tracking conversions, [Facebook]

9  recommend[s] that [the client] use them to … optimize [] ads for website conversions."[71]

10    87.    A "custom audience is an ad targeting option"[72] that can be used by advertisers, like

11  Defendant, "to find people most likely to respond to [their] ad[s]."[73]  Clients can "[c]reate [an]

12  online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their]

13  ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most

14  likely to take action.  Once [an] ad starts running, [Facebook's] system will learn who is engaging

15  with it and, over time, narrow [the] audience [to help] reach more of the right people."[74]

16
17  [67] *Specifications For Meta Pixel Standard Events*, META,
    https://www.facebook.com/business/help/402791146561655 (last accessed Feb. 4, 2025).  *See also*
18  *Meta Pixel: Standard Events*, Meta, https://developers.facebook.com/docs/meta-pixel/reference
    (last accessed Feb. 4, 2025).

19  [68] *About Standard And Custom Website Events*, META,
    https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025); *see also*
20  *Marketing API: App Events API*, Meta, https://developers.facebook.com/docs/marketing-api/app-
    event-api/ (last accessed Feb. 4, 2025).

21
    [69] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last accessed Feb. 4,
22  2025).

23  [70] *Meta Pixel: Conversion Tracking*, META, https://developers.facebook.com/docs/meta-
    pixel/implementation/conversion-tracking (last accessed Feb. 4, 2025).

24  [71] *Id.*

25  [72] *About Custom Audiences*, META, https://www.facebook.com/business/help/744354708981227
    (last accessed Feb. 4, 2025).
26
27  [73] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last
    accessed Feb. 4, 2025).

28  [74] *Id.*

Advertisers can target, *inter alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's] current customers."[75]

88.    "Advantage+ catalog ads are dynamically created by populating an ad template with product information found in a data feed.  This allows [Facebook clients like Defendant] to create thousands of ads without having to configure each of them individually."[76]  Clients "can also use Advantage+ catalog ads to target visitors based on how they have interacted with [their] website in the past."[77]

89.    In short, Facebook states[78] that the Pixel can be used to:

- Make sure your ads are shown to the right people.  Find new customers, or people who have visited a specific page or taken a desired action on your website.

- Drive more sales.  Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- Measure the results of your ads.  Better understand the impact of your ads by measuring what happens when people see them.

90.    Gathered information is also used for analytics.  Namely, the Pixel helps "understand[] the actions people take on [a] website."[79]  "Examples of actions include adding an item to their shopping cart or making a purchase.  The Pixel receives these actions, or events, which [] can [be] view[ed] on [the] Meta Pixel page in [the Facebook] Events Manager.  From there, [a client will] be able to see the actions that [its] customers take."[80]  This allows Facebook clients to "segment [their] website visitors into groups based on the actions they have taken on

---

[75] *Id.*

[76] *Meta Pixel for Advantage+ Catalog Ads*, META, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads (last accessed Feb. 4, 2025).

[77] *Id.*

[78] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153 (last accessed Feb. 4, 2025).

[79] *Id.*

[80] *Id.*

[their] website."[81]  Additionally, with the Pixel, clients can "[a]dd events on the pages that matter to [their] business to help [] understand [] customers' journey[s]. If [one were to] set up events along their path (for example, from product page views to a purchase) it may help [] measure and optimize [] ads for the conversions that mean the most to [one's] business."[82]

91.     Defendant uses the Pixel for such marketing, advertising, and analytics purposes. Defendant obtains revenue from the book and audiobook purchases of users on the eCampus Service.  Defendant knows that its ability to generate revenue depends in large part on the quality of its catalog content.  Therefore, Defendant employs the Pixel to spy on users and intercept the communications of users viewing and obtaining reading material.  Defendant then gathers that information and catalogs it, creating an individualized profile of each user.

92.     Defendant analyzes large masses of this user profile information to locate trends and adjust its digital content accordingly, as well as to serve "interest based ads" to users.

93.     ***Listrak.***  In addition, Defendant enables Listrak to intercept personally identifiable information and record of materials viewed and obtained of users on the Website so that Listrak can help Defendant launch marketing campaigns, target specific users with advertising, and analyze Website users' data.

94.     Listrak begins by "[o]bserv[ing], report[ing] and react[ing] to customers before they have provided … an email or mobile number."[83]  This "historical data" allows Defendant to "better personalize from the point of acquisition" and thus increase marketing and retention.[84] This ultimately helps Defendant "[u]nderstand [its] audience by following their actions to help … predict their next steps."[85]

---

[81] *Custom Audiences*, META, https://developers.facebook.com/docs/meta-pixel/implementation/custom-audiences (last accessed Feb. 4, 2025).

[82] *About Standard And Custom Website Events*, META, https://www.facebook.com/business/help/964258670337005 (last accessed Feb. 4, 2025).

[83] *Unified Customer Data*, LISTRAK, https://www.listrak.com/platform/unified-customer-data (last accessed June 4, 2025).

[84] *Id.*

[85] *Id.*

95.    "From browse and engagement activity to purchase and lifecycle events, there are countless indicators pointing to where the customer is in their unique journey. Listrak will listen and respond to these individual consumer signals of intent, translating them into actionable touchpoints of communication for maximum impact."[86]  These "[p]urpose-built products" lead to "increased customer retention, engagement and ultimately revenue [for Defendant]."[87]

96.    In other words, based on Listrak's accrued user behavior data and user profiles, Defendant can set up advertising campaigns to target certain groups of people.  Thus, Listrak's accrued user data allows Defendant to enhance its marketing and advertising to Website users and provides analytics support to further boost Defendant's data analytics processes.

## CLASS ACTION ALLEGATIONS

97.    **Class Definition:** Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons in the state of California who, during the class period, had their personally identifiable information or protected reading information intercepted by Facebook, Listrak, or other third party entities, as a result of using the Website (the "Class").

98.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

99.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

100.    Excluded from the Class is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

---

[86] *Id.*

[87] *Why Listrak*, LISTRAK, https://www.listrak.com/company/why-listrak (last accessed June 4, 2025).

101.    **Numerosity/Ascertainability.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Facebook and Listrak.

102.    **Typicality.**  Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and, as a result of Defendant's unlawful conduct, had her personally identifiable information and private reading information intercepted by Facebook and Listrak without their express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

103.    **Adequacy.**  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of data privacy litigation specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

104.    **Common Questions of Law and Fact Predominate/Well Defined Community of Interest.**  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632; when the Third Parties are third-party eavesdroppers; and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

105.    **Superiority.**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual

actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**COUNT I**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf Of The Class)**

106.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the members of the Class.

107.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications."  Cal. Penal Code § 630.

108.    A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

Cal. Penal Code § 631(a).

109.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.  *Id.*

110.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

111.    At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

112.    Defendant, when aiding and assisting the wiretapping by the Third Parties, intended to help Facebook and Listrak learn some meaning of the content in the URLs and the content the user viewed or requested.

113.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Pixel and the Listrak Tracker both fall under the broad catch-all category of "any other manner":

    a.    The computer codes and programs that Facebook used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b.    The computer codes and programs that Listrak used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    c.    Plaintiff's and Class Members' browsers;

    d.    Plaintiff's and Class Members' computing and mobile devices;

    e.    Facebook's web and ad servers;

    f.    Listrak's web and ad servers;

    g.    The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

    h.    The web and ad-servers from which Listrak tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

    i.    The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website;

      j.    The computer codes and programs used by Listrak to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

      k.    The plan Facebook carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while were using a web browser to visit Defendant's website.

      l.    The plan Listrak carried out to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while were using a web browser to visit Defendant's website.

114.    The reading records that Defendant permitted Facebook to intercept via the Website's integration of the Facebook Pixel, including users' history of purchased and viewed book and audiobook materials, constitutes protected information.

115.    The reading records that Defendant permitted Listrak to intercept via the Website's integration of the Listrak Tracker, including users' history of purchased and viewed book and audiobook materials, constitutes protected information.

116.    As demonstrated above, Defendant violated the CIPA by aiding and permitting third parties to receive its users' online communications through the Website without their consent while in transit.

117.    As a result of the above violations, Defendant is liable to Plaintiff and Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

118.    Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632
### (On Behalf Of The Class)

119.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

120.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

121.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

122.    Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

123.    Listrak's platform or tools are also "electronic amplifying or recording device[s]."

124.    Cal. Gov't Code § 7927.105 states that a "patron use record[]" includes both:

> (1) Any written or electronic record that is used to identify a library patron and is provided by the patron to become eligible to borrow or use books and other materials. This includes, but is not limited to, a patron's name, address, telephone number, or email address.
>
> And
>
> (2) Any written record or electronic transaction that identifies a patron's borrowing information or use of library information resources. This includes, but is not limited to, database search records, borrowing records, class records, and any other personally identifiable uses of library resources, information requests, or inquiries.

125.    Cal. Civ. Code § 1798.90 states that "personal information" means:

> (A) Any information that identifies, relates to, describes, or is associated with a particular user, including, but not limited to, the information specifically listed in Section 1798.80.
>
> (B) A unique identifier or Internet Protocol address, when that identifier or address is used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form.

(C) Any information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or a book, in whole or in partial form.

126.    Accordingly, any information that "is used to identify a library patron," "identifies, relates to, describes, or is associated with a particular user" of a book service, "identifies a patron's borrowing information or use of library information resources," constitutes a "unique identifier [that] … is used to identify, relate to, describe, or be associated with a particular user or book," or "relates to, or is capable of being associated with a particular user's access to or use of a book service or a book" qualifies as protected information under California law.  Plaintiff and Class Members accordingly had a privacy right to keep their search and purchase records of reading materials made on the eCampus Service confidential.

127.    Specifically, the following pieces of information provided by Plaintiff and Class Members to the Website constitute private, protected information: users' FIDs (and through them, their publicly available Facebook accounts), users' email addresses, first and last names, users' specific book title search requests on the eCampus Service, and users' rented purchased materials on the eCampus Service and their corresponding ISBNs, when intercepted in conjunction with users' personally identifying information.

128.    At all relevant times, Defendant used Facebook Business Tools to allow Facebook eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.  In addition, at all relevant times, Defendant used Listrak's platform and suite of technological tools to allow Listrak to eavesdrop on and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

129.    When communicating with Defendant and using the eCampus Service, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Gov't Code § 7927.105 and Cal. Civ. Code § 1798.90.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and therefore did not expect that other, third-party entities like Facebook and Listrak, would

intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

130.    Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff or Class Members consented to Facebook and Listrak's intentional use of electronic amplifying or recording devices to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

131.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT III
### Invasion Of Privacy Under California's Constitution
### (On Behalf Of The Class)

132.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

133.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected reading information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

134.    At all relevant times, by using the Facebook Pixel to record and communicate users' FIDs alongside their protected reading activity, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.  In addition, at all relevant times, by using the Listrak Tracker to record and communicate users' Listrak accounts alongside their protected reading activity, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

135.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, and reading information would remain confidential and that Defendant would not install wiretaps such as the Pixel and the Listrak Tracker on the Website.

136.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' protected reading history alongside their personally identifiable information to third parties such as Facebook and Listrak.

137.    This invasion of privacy is serious in nature, scope, and impact because it relates to users' protected communications requesting or obtaining reading materials.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

138.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    For a determination that this action is a proper class action;

b.    For an order certifying the Class, naming Plaintiff Clark as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and Class Members their reasonable attorneys' fees and expenses and costs of suit; and

k.     For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated:  June 5, 2025

**BURSOR & FISHER, P.A**.

By: /s/ *Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ehorne@bursor.com

*Attorneys for Plaintiff and the Putative Class*